UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 21-CR- 635 (CJN) |
| : | |
| SUSAN ENGONWEI TINGWEI, : | |
| : | |
| Defendant. : | |

## STATEMENT OF OFFENSE

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits the following Statement of Offense in the above-captioned case.

The following proffer of evidence is intended only to provide the Court with enough evidence to satisfy the mandate of Rule 11(b)(3) of the Federal Rules of Criminal Procedure. This proffer is not intended to be a disclosure of all the evidence available to the United States.

The parties stipulate to the following facts.

### I. BACKGROUND

1. SUSAN ENGONWEI TINGWEI ("TINGWEI") was enrolled in the Master of Laws program at the University of Maryland, Francis King Carey School of Law, ("UMD") located in Baltimore, Maryland, from August 2016 to May 2017. She completed thirteen credit hours during the Fall 2016 semester and seventeen credit hours during the Spring 2017 semester. TINGWEI earned her Master of Laws degree on May 19, 2017. She was admitted to the New York bar on February 22, 2018.

2. D.C. Medicaid is a health care benefit program as defined by 18 U.S.C. § 24(b). It is funded by the federal and District of Columbia governments and provides health insurance benefits, items, and services primarily to residents of the District of Columbia whose incomes are

below a certain financial threshold as measured against the poverty line. These individuals are "Medicaid beneficiaries."

3. In the District of Columbia, home health agencies ("HHAs") can provide certain services including personal care services. Personal care services are intended to assist Medicaid beneficiaries in performing the activities of daily living, such as getting in and out of bed, bathing, dressing, and eating.

4. To be eligible to participate in Medicaid, HHAs must agree to abide by all federal and local laws, regulations, and program manuals governing Medicaid reimbursements. To receive reimbursement from Medicaid, HHAs operating in the District of Columbia are required to submit a claim, either electronically or in paper form, to the D.C. Department of Health Care Finance. As part of the claim, an HHA must provide certain information, such as the name of the Medicaid beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was provided, and the amount of money being claimed by the HHA as payment from Medicaid. Medicaid only pays for services that are medically reasonable and necessary, and that are actually provided as claimed.

5. HHAs employ and contract with personal care aides ("PCAs") to provide services to Medicaid beneficiaries. Under the Medicaid rules, a PCA must meet certain qualifications, including being at least 18 years of age, being a citizen of the United States or an alien who is lawfully authorized to work in the United States, completing a home health aide training program, and passing a competency evaluation for the services which the PCA is required to perform. PCAs are issued a unique 10-digit National Provider Information ("NPI") number, which the HHA uses to bill Medicaid for services rendered to a beneficiary based on timesheets submitted by the PCA.

6.      To receive personal care services under Medicaid, a beneficiary must obtain a prescription from a doctor, informally known as an "intake." Medicaid only pays for personal care services if the doctor determines after a face-to-face physical examination that the beneficiary has functional limitations in one or more activities of daily living.

7.      A beneficiary takes the intake to an HHA, which in turn arranges for a registered nurse to perform an initial assessment of the beneficiary's functional status and needs. The nurse drafts a Plan of Care ("POC") for the beneficiary based on the assessment. The POC is required to specify the frequency, duration, and expected outcome of the personal care services and is supposed to be tailored to address the individual needs of the beneficiary.

8.      The HHA then assigns a PCA to provide personal care services set forth in the POC to the beneficiary. Services are typically provided in the beneficiary's home and PCAs must document the provided care on a timesheet that is submitted to the HHA. The timesheet is supposed to accurately reflect the date the PCA provided services, the itemized services rendered, the amount of time spent providing each service, and the location at which the services were provided. Timesheets are supposed to be signed each day by both the PCA and the beneficiary. However, a single timesheet can contain a full week of services. HHAs use the timesheets to determine and justify the hours of services for which the HHA files a reimbursement claim with Medicaid.

9.      At various times between 2016 and 2018, TINGWEI was employed by at least two different HHAs. The HHAs that employed TINGWEI were registered to do business in the District of Columbia to provide home health services to Medicaid beneficiaries.

**II.     DEFENDANT'S SCHEME**

10.     Beginning no later than August 2016 and continuing through September 2018, TINGWEI caused false claims to be submitted to D.C. Medicaid under her name and NPI number,

which ended in 4442, for personal care services that she did not actually render. TINGWEI acknowledges that she successfully defrauded the D.C. Medicaid program out of $131,656.12.

### A. OVERLAPPING HOURS

11.     On approximately 118 occasions, between August 2016 and May 2017, TINGWEI submitted timesheets claiming that she worked as a PCA in the District of Columbia during the same hours when she either was scheduled to attend law school courses at the University of Maryland or should have been traveling to or from Baltimore related to her law school program. During these approximate 118 occasions, TINGWEI consistently submitted timesheets claiming to have provided PCA services to two different Medicaid beneficiaries, B-1 and B-2, working on average, a total of thirteen hours a day as a PCA. B-1 and B-2 lived together. D.C. Medicaid claims data confirmed that HHAs billed Medicaid for TINGWEI's purported PCA services.

12.     For example, TINGWEI caused Medicaid to be billed for PCA services that she allegedly provided to B-1 and B-2 on April 13, 2017. Her timesheets showed her purporting to provide services to B-1 from 7:00 AM to 3:00 PM and to B-2 from 3:30 PM to 8:30 PM. TINGWEI had two law school classes scheduled that day, one from noon to 12:55 PM and the other from 6:30 PM to 9:35 PM. UMD records showed TINGWEI's key card being swiped on campus at 5:30 PM and swiping out at 9:29 PM. Cell phone records showed TINGWEI's cell phone being in Baltimore on that date at, among other times, approximately 8:03 AM, 8:53 AM, 12:00 PM, 1:03 PM, 2:08 PM, 2:53 PM, 5:04 PM, 6:08 PM, 7:22 PM, 8:41 PM, and 9:31 PM. Medicaid issued $262.60 of payments to two HHAs for PCA services that TINGWEI fraudulently claimed she provided that day.

**B. Billing for Services Not Rendered While Under Surveillance**

13.     TINGWEI also caused Medicaid to be billed for PCA services that she allegedly provided on days when law enforcement was conducting surveillance of her.

14.     For example, on April 20, 2017, law enforcement conducted surveillance of TINGWEI beginning at or around 5:49 AM and ending at or around 12:00 PM. D.C. Medicaid claims data for April 20, 2017 revealed that TINGWEI caused D.C. Medicaid to be billed $161.60 for eight hours of PCA services that she purportedly provided to B-1 and $101.00 for five hours that she purportedly provided to B-2. Her timesheets asserted that she provided PCA services to B-1 from 7:00 AM to 3:00 PM and to B-2 from 3:30 PM to 8:30 PM. However, at or around 8:27 AM, TINGWEI was observed leaving her Silver Spring residence. After making a couple of stops, she drove to Baltimore, Maryland, arriving at approximately 9:31 AM. At 9:38 AM, TINGWEI was observed entering a Baltimore parking garage. Shortly thereafter, she walked into the University of Maryland School of Law building. Although law enforcement terminated its surveillance at 12:00 PM, TINGWEI's cell phone records showed her in Baltimore at, among other times, 1:19 PM, 2:27 PM, 3:02 PM, 6:08 PM, 8:09 PM, 8:56 PM, and 11:39 PM.

15.     Further, on May 16, 2017, law enforcement conducted surveillance on TINGWEI at her residence in Silver Spring, Maryland, beginning at approximately 5:52 AM. D.C. Medicaid claims data for May 16, 2017, revealed that TINGWEI caused Medicaid to be billed $262.60 for thirteen hours of PCA services she purportedly provided to B-1 and B-2. TINGWEI's HHA timesheets for this date show her claiming to have provided PCA services to B-1 from 7:00 AM to 3:00 PM and services to B-2 from 3:30 PM to 8:30 PM. At approximately 7:05 AM, TINGWEI departed her residence in her vehicle. After a couple of stops in Takoma Park, Maryland, and Silver Spring, Maryland, she arrived at a parking garage in Baltimore around 9:37 AM. At approximately

9:50 AM, TINGWEI entered the Southern Campus Center at UMD. At approximately 10:55 AM, TINGWEI departed the area. Approximately thirty minutes later, she arrived in Laurel, Maryland. At approximately 11:46 AM, she drove to her residence, arriving at approximately 12:19 PM. Law enforcement agents observed her depart her residence with an unidentified man at approximately 7:08 p.m. She and the man drove to an ATM in Silver Spring. Then, at approximately 7:37 PM, law enforcement saw TINGWEI and the unidentified man arrive at a Total Wine location in Laurel, Maryland. Soon thereafter, law enforcement terminated surveillance.

### III. CONCLUSION

16. TINGWEI knew that the information set forth in the timesheets using her NPI number and name that were submitted to HHAs was false. She willfully submitted false timesheets to HHAs intending to be paid for services that she did not provide, and she intended for the home health agencies to submit the false information to D.C. Medicaid to obtain payment for the services that she did not provide.

17. Furthermore, TINGWEI admits that the proceeds that she earned as a result of the scheme have been dissipated by her and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court.

Respectfully Submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By: /s/ Kondi J. Kleinman

KONDI J. KLEINMAN
Assistant United States Attorney
California Bar No. 241277
Fraud Section
555 Fourth Street, N.W
Washington, D.C. 20530
(202) 252-6887
Kondi.Kleinman2@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime that is charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I read every word of this Statement of Offense. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: 10/15/2021

Susan Engonwei Tingwei
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Offense and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 10/19/21

Harry Suissa, Esq.
Counsel for Defendant Susan Engonwei Tingwei