UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 21-CR-635 |
| | : | |
| v. | : | |
| | : | |
| SUSAN ENGONWEI TINGWEI, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

Defendant Susan Engonwei Tingwei, a licensed attorney, defrauded the D.C. Medicaid program out of more than $125,000. She acknowledged committing a significant portion of the fraud while she was enrolled in the Master of Laws program at the University of Maryland. Although Tingwei has admitted defrauding Medicaid, her initial statements to the probation officer who prepared her presentence report ("PSR") included an express assertion that she committed fraud between August 2016 and May 2017, but not between January 2016 and July 2016, i.e., before she started her LLM program. Because the evidence proves otherwise, the government agrees with the PSR's determination that she has not clearly demonstrated acceptance of responsibility for her offense and thus should not receive two points acceptance credit. If she were to receive acceptance credit, her recommended sentence under the U.S. Sentencing Guidelines is 10 to 16 months. Without such credit, the recommended sentence is 15 to 21 months. The government respectfully requests that the Court sentence Tingwei to 15 months' imprisonment followed by three years of supervised release.

**I.      Background**

Tingwei grew up in Cameroon. PSR ¶ 66. She immigrated to the United States more than a decade ago and became a naturalized citizen in July 2015. PSR ¶ 67. She received her Bachelor of Science in Law and Political Science from a Cameroon university in 2003, and her LLM from

the University of Maryland in 2017. PSR ¶ 78. After passing the New York bar exam, she was admitted to the New York and Maryland State Bars. PSR ¶ 80. Notwithstanding her November 2021 guilty plea, Tingwei is still an active attorney with approximately 80 clients. PSR ¶ 87; *see* Exhibit One (New York and Maryland online records regarding her status as an attorney).

Tingwei was employed as a personal care aide ("PCA") for various home health agencies between 2009 and 2018. *See* PSR ¶¶ 83-86. Home health agencies hire PCAs to provide personal care aide services to Medicaid beneficiaries. Medicaid exists to ensure that people with limited resources can obtain health care. As a PCA, Tingwei was required to accurately document on timesheets the services that she provided to Medicaid beneficiaries. Home health agencies relied on her timesheets to bill Medicaid for services rendered.

As detailed in the Statement of Offense, on more than 100 occasions between August 2016 and May 2017, Tingwei submitted timesheets claiming that she worked as a PCA in the District of Columbia during hours when she was scheduled to attend law school courses or when she should have been traveling to or from Baltimore. For example, Tingwei claimed she provided services on April 13, 2017, to B1 from 7AM to 3PM and to B2 from 3:30PM to 8:30PM even though she had law school classes from noon to 12:55PM and 6:30PM to 9:35PM that day. University of Maryland records showed her key card being swiped on campus at 5:30PM and swiping out at 9:29PM. T-Mobile records showed her cell phone being in Baltimore that day at, among other times, 8:03AM, 8:53AM, noon, 1:03PM, 2:08PM, 5:04PM, 6:08PM, 7:22PM, 8:41PM, and 9:31PM.

Law enforcement interviewed Tingwei on October 24, 2016, while she was actively enrolled in the Maryland LLM program and while she was actively committing Medicaid fraud. During the interview, she claimed that she never billed for hours that she did not work. She

acknowledged that sometimes she was late and did not adjust her timesheet to show correct times but asserted that she had never been more than 30 minutes late for work. Towards the end of the interview, she was asked if her timesheets were 100 percent accurate. She replied that she "cannot answer that question." After the interview, instead of deciding to no longer engage in Medicaid fraud, Tingwei doubled down on her scheme and continued to defraud Medicaid.

As part of the plea agreement, the parties stipulated to a $131,656.12 loss figure, which represented the actual amount of money that Medicaid paid to HHAs in connection with services that Tingwei purportedly provided to B1 between January 2016 and September 2018 ($107,284.32) and in connection with services that Tingwei purportedly provided to B2 between August 2016 and May 2017 ($24,731.80).

### A. *Tingwei's False Statement to the Probation Officer Asserting that She Committed No Fraud Before Law School*

In Tingwei's initial statements to the presentence report writer, she challenged the agreed-to loss amount. She wrote, "The date of January 2016 to July 2016, I was not in school and did not commit *any* fraud and there is nothing in the record to reflect that any wrongdoing took place." PSR ¶ 34 (emphasis added).

Tingwei's assertion that she did not commit any fraud prior to her enrollment at the University of Maryland is belied by the evidence. Bank of America records showed Tingwei depositing or withdrawing money in Maryland on days when she purported to provide PCA services in D.C. to B1 and/or B2. Specifically, she conducted such transactions on seven days in January 2015, five days in February 2015 (one transaction took place in Virginia), ten days in March 2015, seven days in April 2015, three days in May 2015, one day in June 2015, one day in September 2015, one day in October 2015, three days in February 2016, five days in March 2016,

3

and four days in June 2017. The Bank of America records do not provide times for the overwhelming majority of these transactions, making it theoretically possible that she engaged in banking activities at times when she was not also purportedly providing PCA services. However, some of the records provided by Bank of America do in fact include times, which contradict Tingwei's timesheets. For example, Tingwei engaged in transactions at 12:36PM in Adelphi, Maryland, on March 30, 2015; at 12:30PM in Mitchellville, Maryland, on May 26, 2015; and at 10:46AM in Adelphi, Maryland, on March 1, 2016. Her timesheets for each of those days showed her purporting to provide B1 with services in the District of Columbia from 7AM to 3PM. Tingwei's timesheets for those three days and the Bank of America records for the specific transactions are attached as Exhibit Two.

Western Union records also contradict any assertion by Tingwei that the fraud was limited just to the period when she was in law school, i.e., August 2016 to May 2017. Western Union records showed her making transactions in Maryland on days and times when, according to her timesheets, she was purportedly providing PCA services. For example, on December 18, 2015, December 31, 2015, February 26, 2016, March 1, 2016, and April 5, 2016, her timesheets showed her providing PCA services to B1 from 7AM to 3PM each day, yet she sent money via Western Union at a Silver Spring, Maryland business, located outside the Beltway, on those days at 12:49PM, 1:07PM, 10:14AM, 10:58AM, and 1:13PM, respectively. The timesheets and the relevant data from the Western Union records are attached as Exhibit Three.

### B. *Tingwei's False Statement to the Probation Officer Asserting that She Committed No Fraud After Law School*

In Tingwei's initial statement to the probation officer, she also wrote, "From June of 2017 until September of 2018, I was already done with school and did not involve [sic] in any

4

wrongdoing as well. The dates included in this record are incorrect. The wrong doings took place between August of 2016 to May of 2017." PSR ¶ 34.

Although Tingwei did not challenge the inclusion of the month of May 2017 in the loss amount, her assertion that she did not engage in any wrongdoing after she was done with school is false. University of Maryland records show her LLM degree being awarded on May 19, 2017, yet she continued to defraud Medicaid after her graduation date. Records show that she caused Medicaid to be billed for services that she allegedly provided on May 20, 2017 (five hours to B2), May 21, 2017 (five hours to B2), May 22, 2017 (13 hours to B1 and B2), May 23, 2017 (eight hours to B1), May 24, 2017 (eight hours to B1), May 25, 2017 (eight hours to B1), May 26, 2017 (eight hours to B1), May 29, 2017 (eight hours to B1), May 30, 2017 (13 hours to B1 and B2), May 31, 2017 (13 hours to B1 and B2), and June 1, 2017 (13 hours to B1 and B2).

T-Mobile records for those particular dates showed her phone in locations that would have made it impossible for her to have provided all of the PCA services that she claimed she provided. For example, on May 20 and May 21, her phone did not ping off any Washington, D.C., towers. On May 22, her phone was only present in the District for no more than 4 hours (she caused Medicaid to be billed 13 hours that day).[1] Notably, this conduct all took place *after* she earned her LLM degree, which completely undercuts her assertions to the presentence report writer that she only engaged in fraud while she was in law school.[2]

---

[1] The T-Mobile cell cite records only cover the period from April 1, 2017 through June 1, 2017.

[2] Tingwei also wrote the following to the presentence report writer, "As for option three, I do not want to go to trial because I know I am guilty of a crime. My only issue has to do with the amount that is being talked about in the plea agreement. Why would I go for trial when I have never denied my guilt?" PSR ¶ 34. The "option three" reference appears to be related to the choices the government presented to her prior attorney to resolve her case. In April 2021, undersigned counsel emailed her then-attorney and presented three potential options. Option One was to agree to the plea agreement that she ultimately accepted, i.e., an

5

## II.  Sentencing Guidelines

The base offense level for health care fraud is six pursuant to USSG §2B1.1(a)(2). PSR ¶ 38. Because the loss amount stipulated to by the parties was more than $95,000 but less than $150,000, an additional 8 levels are added pursuant to USSG §2B1.1(b)(1)(E). PSR ¶ 39. The defense contends that a two-level reduction, pursuant to USSG §3E1.1(a), is warranted, arguing that the defendant has clearly demonstrated acceptance of responsibility. The government and the presentence reporter writer disagree, believing Tingwei's statements to the presentence report writer do not demonstrate clear acceptance. The defendant has no criminal history. PSR ¶ 49. Thus, to the extent the Court agrees that Tingwei is not entitled to a two-level reduction for acceptance of responsibility, the recommended guidelines range based on a total offense level of 14 and Criminal History Category I is 15 to 21 months. PSR ¶ 98. If the Court believes that she is entitled to acceptance credit, the recommended guidelines range for a total offense level of 12 and Criminal History Category I is 10 to 16 months. *See* PSR ¶ 99.

---

actual loss amount of $107,284.32 incurred for services purportedly provided to B1 during a specific period, plus an actual loss amount of $24,731.80 for services purportedly provided to B2 (B1's son) during a specific period. Option Two was to plead guilty without an agreed-to loss amount with both parties reserving the right to litigate the loss amount as part of sentencing. Notably, claims data showed Medicaid being billed $589,096 for PCA services that Tingwei claimed to provide between September 2012 through September 2018, and issuing payments totaling $394,910 in conjunction with those claims. Option Three was to go to trial.

Tingwei seemed to also put emphasis on the specific timeframe alleged in the charging documents, referencing a starting period of August 2016 and claiming the ending period should have been May 2017. *See* PSR ¶ 34. Tingwei is correct that the information and Statement of Offense described her fraudulent conduct as "beginning no later than August 2016," which was language her prior counsel negotiated. Notwithstanding the August 2016 language, the parties agreed to a stipulated loss amount reflecting actual monies paid in connection with services that Tingwei purported to provide to B1 and B2 during the above-noted periods. Moreover, the Statement of Offense's prefatory language noted that the document was only intended "to provide the Court with enough evidence to satisfy the mandate of Rule 11(b)(3) of the Federal Rules of Criminal Procedure," and that it was "not intended to be a disclosure of all the evidence available to the United States." ECF No. 46 at 1.

### III.     Acceptance of Responsibility

In determining whether a defendant qualifies for acceptance credit, the Guidelines instruct a court to consider whether the defendant

> truthfully admit[ed] the conduct comprising the offense of conviction, and truthfully admit[ed] or [did] not falsely deny any additional relevant conduct. . . .  A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous.

USSG §3E1.1, comment. (n.1(A)). Moreover, the Guidelines provide that although entry of a guilty plea generally constitutes significant evidence of acceptance of responsibility, a "defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." USSG §3E1.1, comment. (n.3). The Guidelines also note, "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." USSG §3E1.1, comment. (n.5).

Given that financial records showed Tingwei engaging in fraudulent conduct before she attended law school and T-Mobile records similarly showed her engaging in fraud after she earned her degree, her comments to the presentence report writer, in which she challenged the agreed-to loss amount and attempted to portray herself as only committing Medicaid fraud while she was in school, did not clearly demonstrate that she accepted responsibility.

In attempting to clean up Tingwei's unfiltered comments to the probation officer, the defense contends that Tingwei should receive acceptance credit because she pleaded guilty to the offense agreed upon in the plea agreement and fully admits that she is guilty of the crimes at issue, including the amounts reflected in the plea agreement. The defense also contends that her


recollection of events is somewhat different than that portrayed by the records but attributes her recollection to being fallible.

If Tingwei thought that limiting the loss amount to the period when she was in school—August 2016 through May 2017—was correct, her belief would at least be understandable (though legally deficient) given that the Statement of Offense's specific examples of fraudulent conduct all took place when Tingwei was in law school. *See* ECF No. 46 at ¶ 11 (noting the August 2016 through May 2017 period), ¶ 12 (April 13, 2017), ¶ 13 (April 20, 2017), and ¶ 15 (May 16, 2017). However, she falsely claimed that she did not engage in any fraudulent conduct between January 2016 and July 2016 ("I was not in school and did not commit any fraud and there is nothing in the record to reflect that any wrongdoing took place") and after law school ("I was already done with school (from June 2017 to September 2018) and did not involve in any wrongdoings as well"). PSR ¶ 34. Accordingly, she has not clearly demonstrated accepted of responsibility for her criminal conduct.

### IV.     The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

        **A.**       **The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense**

The defendant engaged in a systematic effort to steal from the D.C. Medicaid program, which exists to help the neediest District residents. The type of fraud perpetrated by Tingwei and other PCAs "directly harms DHCF[]and District of Columbia Medicaid beneficiaries by diverting funds that could be used for other individuals in need, or for other District of Columbia government priorities." ECF. No. 66 at 2. Because "PCA services help the most vulnerable and infirm Medicaid beneficiaries conduct their activities of daily living in their home and community, instead of moving to a nursing facility[,] Tingwei's victimization of this program is particularly disturbing given the needs of this population." *Id.*

Stealing from a program designed to help the neediest District residents is serious. Doing so while attending law school and continuing to do so after being interviewed by the FBI only heightens the seriousness of the offense. Such behavior warrants a significant prison sentence.

        **B.**       **The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

Medicaid fraud in the United States is a multi-billion-dollar industry. In 2015, the General Accountability Office estimated that Medicaid made $29 billion in improper payments, including for services billed but not provided. *See* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-16-402, MEDICAID PROGRAM INTEGRITY: IMPROVED GUIDANCE NEEDED TO BETTER SUPPORT EFFORTS TO SCREEN MANAGED CARE PROVIDERS (Apr. 2016). The D.C. Department of Health Care Finance attempts to monitor the activities of PCAs to prevent fraud but cannot catch every fraudster. *See* ECF. No. 66 at 2. Thus, when individuals are convicted of defrauding Medicaid, imprisonment is appropriate both to promote respect for the law and to deter other PCAs from engaging in fraud.

9

### C. The History and Circumstances of the Defendant

Tingwei immigrated to this nation to pursue a better life. Her oldest daughter described her as "really kind, supportive, and optimistic, particularly as it pertains to the family." PSR ¶ 68a. Others have very favorable opinions of her. *See generally* ECF No. 67 ("Defendant's Sentencing Memorandum") at 12-24. She managed to earn an LLM degree in the United States, get licensed to practice law in New York and Maryland, and open her own legal practice. Her achievements would normally be cause for complete celebration. Sadly, instead of lawfully pursing the American dream, however, she repeatedly decided to engage in criminal conduct and did so before, during, and after law school, and even after the FBI questioned her. Thus, a prison sentence is warranted.

### D. Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533. A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

Numerous former PCAs have been sentenced by judges in this courthouse.

10

In December 2018, Judge Collyer sentenced Vincent Njong, 18-cr-216, to 36 months of probation to include six months of home confinement. Njong's criminal conduct, which involved submitting false timesheets and paying kickbacks to beneficiaries, was limited to approximately 18 months, involved two beneficiaries and two home health agencies, and resulted in a loss to the Medicaid Program of $66,086. Njong's final offense level was 10, resulting in a recommended imprisonment range of 6 to 12 months, making him probation eligible. Njong appeared to have committed the fraud to provide for his family during a period of economic distress. He also ended his criminal conduct at least three years before the government served him with a subject letter.

In October 2019, Judge Bates sentenced Mobolaji Stewart, 19-cr-242, to 13 months in prison. Judge Bates found that an 18-month sentence—the bottom of the guidelines—was appropriate, but that a five-month departure was warranted under *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), because Stewart's status as a non-citizen was likely to cause a fortuitous increase in the severity of punishment. Stewart engaged in a four-year scheme that resulted in a loss to the government of $534,073. Stewart was employed by 12 HHAs and was the second-highest paid PCA in the D.C. Medicaid Program for two years. She paid kickbacks to beneficiaries and caused Medicaid to be billed for overlapping hours and time when she was abroad.

In December 2019, Chief Judge Howell sentenced former PCA Nkiru Uduji, 19-cr-289, to three years of probation. Uduji caused a $537,000 loss to the government, resulting in a recommended sentencing range of 18 to 24 months. Uduji's counsel proffered that she was essentially the sole caretaker for her three children, ages 11, 15, and 16, and that the children were solely dependent upon her and would have to be placed into foster care if she were imprisoned. Her attorney also proffered that her ex-husband was physically and mentally abusive and did not

support the family, which might have caused her to resort to fraud. The attorney also proffered that all of the fraudulently-obtained funds were used for basic living expenses.

In February 2020, this Court sentenced Rose Gana, 19-cr-305, for defrauding Medicaid out of $441,234. Gana was employed as a PCA by nine different HHAs between October 2013 and December 2018. During that time, she submitted false timesheets to HHAs and paid kickbacks to beneficiaries. The guidelines recommended a sentence of 18 to 24 months. This Court granted a variance and imposed a 13-month sentence after finding that Gana had engaged in extensive charitable activities supporting immigrants in America and persons in need in Cameroon.

In February 2020, Judge Hogan sentenced former PCA Temitope Ogunbiyi, 19-cr-254[3], to 15 months in prison. Ogunbiyi engaged in a nearly five-year scheme to defraud Medicaid, which involved her securing employment with at least eighteen different HHAs, submitting timesheets for up to 51 beneficiaries, paying kickbacks, and using two NPI numbers to bill Medicaid. For two years, she was the highest paid PCA in the D.C. Medicaid Program; she defrauded Medicaid out of more than one million dollars. Her recommended guidelines range was 30 to 37 months, but the government filed a five-level downward departure motion based on substantial assistance, which the Court granted, resulting in a final guidelines range of 15 to 21 months.

In September 2020, Judge Kollar-Kotelly sentenced Hope Falowo, 19-cr-314, to 13 months of incarceration. Although the guidelines called for an 18 to 24 month sentence, the Court granted a departure and a variance. The departure was based on Falowo's "family ties and responsibilities" and her "charitable service/good works." The variance was based, in part, on ensuring parity with sentences received by other defendants.

---

[3] The case is not currently accessible on PACER, but Judge Hogan unsealed the entire case from the bench during the sentencing hearing.

In January 2021, Judge Kollar-Kotelly sentenced Janet Akindipe, 20-cr-196, to 13 months of incarceration. Akindipe confessed to law enforcement in a post-arrest interview and quickly reached a plea agreement with the government. She admitted that she engaged in a five-year scheme to defraud Medicaid out of nearly $270,000, which included paying kickbacks to beneficiaries. Akindipe supplemented her full-time job (as an employee at NIH) through the fraud scheme. The Guidelines recommended a sentence of 18 to 24 months' imprisonment.

In May 2021, Judge Walton sentenced Folashade Horne, 21-cr-16, to 13 months of incarceration. Horne engaged in a six-year scheme that caused Medicaid to be defrauded out of more than $370,000. She worked as a full-time employee at a local hospital yet submitted timesheets claiming that she provided PCA services when she was working at the hospital. Her recommended guidelines range was 18 months to 24 months.

In May 2021, Judge Chutkan sentenced Charlotte Etongwe, 20-cr-114, to five years of probation. Etongwe defrauded Medicaid out of more than $350,000 over approximately five years. The guidelines recommended a sentence of 18 to 24 months. Judge Chutkan imposed probation based, in large part, on Etongwe having five young children who would not have an adequate support network if she were incarcerated. Judge Chutkan also granted a *Smith* variance because Etongwe was not a U.S. citizen. Before she was sentenced, Etongwe engaged in significant restorative efforts to educate others about the dangers of engaging in the behavior that she did.

In November 2021, Judge Friedrich sentenced Sikirat Brown, 21-cr-473, to 13 months' imprisonment. Brown defrauded Medicaid out of more than $340,000 over a six-year period. The guidelines recommended a sentence of 18 to 24 months. Judge Friedrich granted a five-month *Smith* departure/variance because Brown was not a U.S. citizen and thus would be ineligible for a

13

halfway house or placement at a minimum-security placement.

Unlike some of the defendants noted above, Tingwei is a U.S. citizen, and thus, will not receive a fortuitous increase in punishment, which renders her ineligible for a *Smith* departure. Moreover, each of the cases noted above involved defendants who received acceptance of responsibility credit. In Ogunbiyi's case, the government also filed a substantial assistance downward departure motion based on Ogunbiyi's post-arrest assistance. Tingwei has provided no such assistance and has attempted to narrow her criminal conduct as much as possible. Moreover, although Tingwei has a minor child, her adult daughter will care for the child during any period of incarceration, alleviating the concerns that existed in the Uduji and Etongwe cases. *See* PSR ¶68a.

Even though Tingwei's stipulated loss amount is lower than every other PCA defendant except Njong, a 15-month sentence, on the facts of her case, would not result in an unwarranted sentencing disparity considering that she engaged in this conduct before, during, and after law school, and falsely tried to minimize the extent of her criminal conduct to the presentence report writer. However, if the Court believes a 15-month sentence would result in an unwarranted sentencing disparity or that Tingwei should in fact receive acceptance credit, the government respectfully suggests that the Court should not vary below the 12 months and one day sentence that is recommended by the probation officer.

### E. Restitution and Forfeiture

The defendant has agreed to pay $131,656.12 in restitution and an identical amount in a criminal forfeiture money judgment. The Court entered a consent order of forfeiture on November 19, 2021. ECF No. 49.

**CONCLUSION**

The government respectfully requests that the Court sentence Susan Tingwei to fifteen months in prison followed by three years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

/s/ *Kondi Kleinman*
KONDI KLEINMAN
California Bar No. 241277
Assistant United States Attorney
Fraud, Public Corruption & Civils Rights Section
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-6887 | Kondi.Kleinman2@usdoj.gov